UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALJIT SINGH, | No.  2: 19-cv-2048 KJN P |
| Plaintiff, | |
| v. | <u>ORDER</u> |
| AGUILERA NICOLAS et al., | |
| Defendants. | |

<u>Introduction</u>

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  The parties consented to the jurisdiction of the undersigned.

Pending before the court is the summary judgment motion filed on behalf of defendant Aguilera (ECF No. 71), and the summary judgment motion filed on behalf of defendants Ullery and Vaughn (ECF No. 87).

For the reasons stated herein, defendant Aguilera's summary judgment motion is granted in part and denied in part, and the motion for summary judgment on behalf of defendants Ullery and Aguilera is granted.

////

////

1    I.      Legal Standard for Summary Judgment

2           Summary judgment is appropriate when it is demonstrated that the standard set forth in

3    Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

4    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

5    judgment as a matter of law."  Fed. R. Civ. P. 56(a).

6                    Under summary judgment practice, the moving party always bears
                the initial responsibility of informing the district court of the basis
7               for its motion, and identifying those portions of "the pleadings,
                depositions, answers to interrogatories, and admissions on file,
8               together with the affidavits, if any," which it believes demonstrate
                the absence of a genuine issue of material fact.
9

10   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

11   56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need

12   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

13   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

14   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

15   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

16   burden of production may rely on a showing that a party who does have the trial burden cannot

17   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

18   should be entered, after adequate time for discovery and upon motion, against a party who fails to

19   make a showing sufficient to establish the existence of an element essential to that party's case,

20   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

21   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

22   necessarily renders all other facts immaterial."  Id. at 323.

23          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

24   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

25   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26   establish the existence of such a factual dispute, the opposing party may not rely upon the

27   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

28

2

form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on March 12, 2021 (ECF No. 47), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

II.      Background

This action proceeds on plaintiff's first amended complaint filed June 14, 2021, against defendants Dr. Aguilera, Dr. Ullery and Dr. Vaughn.  (ECF No. 51.)  Plaintiff alleges that defendants violated his Eighth Amendment right to adequate medical care.

Plaintiff alleges that in June 2017, plaintiff sought treatment from defendant Aguilera for left ear pain and discharge coming from his left ear.  Plaintiff alleges that defendant Aguilera failed to take an ear swab specimen from his left ear and failed to treat his ear infection accordingly.  Plaintiff alleges that he suffered pain and hearing loss in his left ear as a result of defendant Aguilera's failure to treat his ear infection.

Plaintiff also claims that defendant Aguilera failed to treat plaintiff's left ear pain and related headaches in July 2018.  As a result, plaintiff had to go to a crisis bed at the California Medical Facility ("CMF") to seek medical treatment.  While in the crisis bed, plaintiff received antibiotics and migraine tablets.

Plaintiff alleges that after he arrived at Mule Creek State Prison ("MCSP") in March 2019, defendant Ullery failed to send plaintiff to an ENT specialist appointment at Highland Medical Center for surgery on his left ear.  Plaintiff alleges that this surgery was already approved by CMF.

Plaintiff alleges that defendant Ullery failed to follow the recommendations from a previous ENT specialist, Dr. Murton at Twin Cities Community Hospital, for plaintiff to have surgery within a certain time frame.  Plaintiff alleges that as a result of the delay in his surgery, on April 7, 2021, an ENT specialist at the Highland Medical Center informed plaintiff that the surgery could not be performed due to the delay.  The ENT specialist told plaintiff that because his ear had progressed to 100% perforation, the ENT specialist had to refer plaintiff to UCSF for

4

1    surgery.

2          Plaintiff alleges that defendant Vaughn failed to look into plaintiff's complaint during the

3    health care grievance process, causing further delay to plaintiff's left ear surgery.  The delay in

4    surgery caused headaches, dizziness, vertigo, ear pain and further hearing loss.

5          Plaintiff seeks money damages and injunctive relief in the form of immediate left ear

6    surgery to be performed at the University of California San Francisco ("UCSF").

7          III.     Legal Standard for Eighth Amendment Claim Alleging Inadequate Medical Care

8          Where a prisoner's Eighth Amendment claim arises in the context of medical care,

9    including mental health care, the prisoner must allege and prove "acts or omissions sufficiently

10   harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429

11   U.S. 97, 106 (1976).  An Eighth Amendment medical claim has two elements:  "the seriousness

12   of the prisoner's medical need and the nature of the defendant's response to that need."

13   McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX

14   Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

15         A medical need is serious "if the failure to treat the prisoner's condition could result in

16   further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974

17   F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include

18   "the presence of a medical condition that significantly affects an individual's daily activities."  Id.

19   at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the

20   objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S.

21   825, 834 (1994).

22         If a prisoner establishes the existence of a serious medical need, he must then show that

23   prisoner officials responded to the serious medical need with deliberate indifference.  See Farmer,

24   511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny,

25   delay, or intentionally interfere with medical treatment, or may be shown by the way in which

26   prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

27   Cir. 1988).

28         Before it can be said that a prisoner's civil rights have been abridged with regard to

medical care, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

A delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm.  McGuckin, 974 F.2d at 1060.

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim.  See Toguchi, 391 F.3d at 1058.

IV.    Defendant Aguilera's Summary Judgment Motion

A.  Defendant Aguilera's Evidence

The undersigned herein sets forth the evidence submitted by defendant Aguilera in support of his summary judgment motion.  The undersigned addresses plaintiff's dispute of defendant's evidence in the analysis of defendant's motion.

On June 21, 2017, defendant Aguilera saw plaintiff at CMF.  (ECF No. 71-3 at 9.)  In relevant part, the notes from this examination state that plaintiff's left ear had discharge in "extreme auditory canal."  (Id.)  Plaintiff also reported seasonal allergies.  (Id.)  Defendant Aguilera prescribed Levulofloxin, an antibiotic commonly used to treat bacterial infections in the ears and sinuses.  (Id. at 2, 9.)  Defendant Aguilera instructed plaintiff to take this medication for five days.  (Id. at 2, 9.)  Defendant Aguilera also started plaintiff on a trial of antihistamine for the seasonal allergies.  (Id. at 2, 9.)

Defendant Aguilera saw plaintiff for a follow-up on June 27, 2017.  (Id. at 2, 10.) Defendant Aguilera noted that plaintiff denied pain in his left ear and he could see no discharge in the left external auditory canal.  (Id. at 10.)  Defendant Aguilera noted "some whitish gel-like

6

material at perforation of ear drum." (Id.)  Defendant Aguilera noted that plaintiff had complex otitis media that was treated with Levulofloxin.  (Id.)  Defendant referred plaintiff to an Ear, Nose and Throat ("ENT") specialist to address the perforated eardrum and otitis media, which is inflammation or an infection located in the middle ear.  (Id. at 2, 10.)

The Request for Services ("RFS") form, submitted by defendant Aguilera on June 28, 2017, requested an ENT consultation for plaintiff.  (Id. at 11.)  Defendant Aguilera wrote on the form that plaintiff had a history of ear trauma at age 20.  (Id.)  Dr. Aguilera wrote on the form that plaintiff had a perforated ear drum, was without pain but continued to have discharge.  (Id.) Defendant Aguilera's request for plaintiff to see the ENT was approved on June 30, 2017.  (Id.)

Defendant Aguilera saw plaintiff for a follow-up on July 25, 2017.  (Id. at 12.)  Defendant Aguilera's notes from this examination state that plaintiff reported that his left ear was better and no longer with drainage.  (Id. at 12.)  Defendant Aguilera wrote that plaintiff had an evaluation with the ENT pending and that plaintiff had the ear problem for several years.  (Id.)

On August 8, 2017, plaintiff was seen by ENT specialist Dr. Colombo at San Joaquin General Hospital.  (Id. at 13.)  Dr. Colombo noted that plaintiff had long-standing perforated tympanic membrane[1] ("TM") of at least ten years.  (Id.)  Dr. Colombo noted that plaintiff reported that he had intermittent chronic drainage from his left ear.  (Id.)  Dr. Colombo noted that plaintiff reported that he had not noticed a significant decrease in hearing in the last ten years, however he has been told that hearing in the left ear is worse compared to the right.  (Id.)  Dr. Colombo discussed the possibility of repairing the TM and recommended an audiogram prior to the next ENT appointment.  (Id.)  Dr. Colombo's notes state, "Since the patient has a history of intermittent drainage, tympanoplasty would be a reasonable option."[2]  (Id.)  Dr. Colombo's notes

---

[1] The tympanic membrane is more commonly known as the eardrum.  See https://www.britannica.com/science/tympanic-membrane.  Tympanic membrane perforation is when the tympanic membrane ruptures, creating a hole between the external and middle ear.  See https://www.ncbi.nlm.nih.gov/books/NBK557887/.

[2] Tympanoplasty, also called eardrum repair, refers to surgery performed to reconstruct a perforated tympanic membrane or the small bones of the middle ear.  See https://www.surgeryencyclopedia.com/St-Wr/Tympanoplasty.html.

1   also state that she discussed dry ear precautions in order to limit the number of infections.  (Id.)

2   On August 10, 2017, based on Dr. Colombo's recommendation, defendant Aguilera filled

3   out an RFS form for plaintiff to have an audiogram.  (Id. at 15-16.)

4   On August 22, 2017, defendant Aguilera saw plaintiff for a follow-up examination.  (Id. at

5   17.)  Defendant Aguilera noted that plaintiff had a "history of long standing TM perforation."

6   (Id.)  Defendant Aguilera noted that plaintiff had a history of intermittent drainage from his left

7   ear.  (Id.)  Defendant Aguilera noted that Dr. Colombo had recommended tympanoplasty to treat

8   the damage to plaintiff's eardrum.  (Id.)  Defendant Aguilera repeated Dr. Colombo's instructions

9   to plaintiff regarding dry ear precautions:  to keep the ear dry by using cotton when showering to

10  prevent infections.  (Id.)  Defendant Aguilera's assessment and plan was for plaintiff to receive

11  the audiogram and then schedule a follow-up ENT visit per Dr. Colombo's instructions.  (Id.)

12  Plaintiff did not go to the audiogram appointment scheduled for September 28, 2017.  (Id.

13  at 18.)  A form titled "Refusal of Examination And/Or Treatment," states that plaintiff did not

14  want to go to the audiogram appointment.  (Id.)  The form states that plaintiff wanted to schedule

15  the audiogram after he talked to his primary care provider.  (Id.)  The form states that the risks

16  and benefits were explained today.  (Id.)  The form also states, in what appears to be plaintiff's

17  handwriting, "IM is not feeling well (sick) today."  (Id.)

18  On October 16, 2017, plaintiff was seen by Dr. Wesley McAllister for an issue with

19  pigmentation under his left eye.  (Id. at 19.)  Plaintiff told Dr. McAllister that he had discharge

20  from his left ear for the past month with occasional pain, but no hearing loss.  (Id.)  Regarding

21  plaintiff's ears, Dr. McCallister noted, "Left canal with mild cerumen, some yellow purulent d/c

22  on canal, TM not well visualized, small area visualized appears nl.  Hearing intact, trace tragal

23  motion tenderness."  (Id.)  Dr. McAllister advised plaintiff to return if his ear gets worse.  (Id.)

24  On November 30, 2017, defendant Aguilera saw plaintiff for a follow-up, but plaintiff

25  complained only of blurry vision and hyperpigmentation under his left eye.  (Id. at 21.)  The

26  section of the form describing plaintiff's physical examination reflects that plaintiff's ears were

27  not included in this examination.  (Id.)  In his declaration submitted in support of the summary

28  judgment motion, defendant Aguilera states that plaintiff raised no issues regarding pain or

hearing loss in his left eardrum.  (Id. at 3.)

On January 29, 2018, plaintiff was seen by Dr. Saukhla.  (Id. at 23-24.)  The notes from this examination state that plaintiff's chief complaint was dark eye skin.  (Id. at 23.)  The section of the form describing plaintiff's physical examination reflects that plaintiff's ears were not included in this examination.  (Id.)

On February 15, 2018, defendant Aguilera saw plaintiff for an appointment related to a grievance plaintiff filed regarding his dissatisfaction with the handling of his skin pigmentation issue.  (Id. at 25.)  Plaintiff requested to see a skin specialist.  (Id.)  The notes from this appointment reflect that plaintiff's ear problems were not discussed.  (Id.)  In his declaration submitted in support of the summary judgment motion, defendant Aguilera states that plaintiff raised no issues regarding pain or hearing loss in his left eardrum during this appointment.  (Id. at 3.)

On April 10, 2018, plaintiff was seen by Registered Nurse ("RN") Valera who noted a foul odor and drainage from plaintiff's left ear in addition to nasal drainage.  (Id. at 26.)

On April 17, 2018, defendant Aguilera saw plaintiff.  (Id. at 27-28.)  The notes from this examination state that plaintiff's chief complaint was "foul smelling left ear discharge.  No mastoid tenderness.  No fever."  (Id. at 27.)  Defendant Aguilera noted,

> Patient also here in regard to left ear issue[.] [P]atient with reports of foul smelling left ear discharge.  Patient has a history of injury to the left ear[.] [P]atient indicates 2 episodes of trauma to the left ear times approximately 12 years.  Patient report that he has intermittent ear infections within the last 12 years.  He has a perforated ear drum.

(Id. at 27.)

In the section of the record titled "Assessment Plan," defendant Aguilera wrote, in relevant part,

> 1.  Left Otitis Media
>
> Patient with a history of recurrent left otitis media.  Currently no evidence of active otitis media [sic] issue with perforated TM [sic] we'll place a request for audiology for audiogram previously approved in August 2017…

(Id.)

In the record from the April 17, 2018 examination, defendant Aguilera also wrote, "HEENT:  Is normocephalic, right tympanic membrane within normal limits, left tympanic membrane with perforation, no discharge at this time[,] TM[,] without erythema.[3]"  (Id. at 27.)

In his declaration, defendant Aguilera states that on April 17, 2018, he noted that plaintiff had been taking antibiotics for a chronic left ear infection, which he has had for twelve years after two injuries to his ears.  (Id. at 4.)  The undersigned cannot locate a note by defendant Aguilera in the records from the April 17, 2018 examination stating that plaintiff had been taking antibiotics for a left ear infection at the time of the April 17, 2018 examination.

On April 17, 2018, defendant Aguilera submitted an RFS for plaintiff for an audiology consultation.  (Id. at 30.)  On April 23, 2018, the Chief Medical Executive approved this RFS.  (Id. at 30.)

On May 17, 2018, defendant Aguilera saw plaintiff for a follow-up regarding his TM perforation with intermittent drainage.  (Id. at 31.)  Defendant Aguilera's notes state that on May 3, 2018, plaintiff was seen by a covering physician.  (Id.)  Defendant Aguilera discussed with plaintiff the need for the audiogram so that the ENT could formulate a treatment plan.  (Id.)  Defendant Aguilera noted that plaintiff had left otitis media.  (Id.)   Defendant noted that plaintiff had been placed on corticosporin eardrops for left otitis media per the covering physician, which plaintiff reported somewhat helped with drainage.  (Id.)  Defendant Aguilera took a swab of the drainage and stated that he would start plaintiff on ciprofloxacin to cover for possible pseudomonas, which are a type of germ that can cause pneumonia and infections.  (Id. at 4, 31-32.)  Defendant also diagnosed plaintiff with left otitis externa, and noted that the ciprofoxican prescribed for the left otitis media was also prescribed for the left otitis externa.[4]  (Id. at 32.)

On May 31, 2018, defendant Aguilera saw plaintiff for a follow-up examination.  (Id. at 33-34.)  Following the course of antibiotics, plaintiff told defendant Aguilera that there was

---

[3]  Erythema means inflammation and/or redness. See https://medical-dictionary.thefreedictionary.com/erythema.

[4] Otitis externa is inflammation of the external ear canal and symptoms can include ear pain and discharge.  See https://www.nhsinform.scot/illnesses-and-conditions/ears-nose-and-throat/otitis-externa.

1 significant improvement of his ear and that he no longer had drainage or pain.  (Id.)  Defendant

2 Aguilera noted that plaintiff was currently pending audiograms at CMF in June 2018.  (Id.)

3 Defendant Aguilera further noted that audiograms had been ordered in the past "but patient

4 unfortunately had refused the audiogram.  Now willing to do audiogram."  (Id.)

5      On June 11, 2018, plaintiff was seen by an audiologist who found mild hearing loss in the

6 right ear and severe loss in the left ear, and recommended that plaintiff seek an ENT evaluation.

7 (Id. at 35.)

8      On June 18, 2018, defendant Aguilera saw plaintiff for a follow-up examination.  (Id. at

9 36-37.)  Defendant Aguilera noted that plaintiff stated that he had an intermittent frontal headache

10 for 2-3 weeks, but no ear pain, drainage, fever, chills or sore throat.  (Id. at 36.)  In his notes,

11 defendant Aguilera noted that plaintiff would "follow up here after HH ENT consult."  (Id.)  By

12 "HH," defendant Aguilera apparently referred to Highland Hospital.  The undersigned cannot

13 locate any records from Highland Hospital in defendant's records regarding a consultation with

14 plaintiff on or around this time.

15      On June 18, 2018, defendant Aguilera submitted an RFS for plaintiff to be seen by ENT

16 specialist Dr. Colombo at San Joaquin General Hospital for surgical repair of his tympanic

17 membrane.  (Id. at 39.)  In his declaration, defendant Aguilera states that on June 20, 2018, the

18 Chief Medical Executive denied this request.  (Id. at 5.)  Defendant Aguilera states that he later

19 learned that at that time, tympanoplasty was not medically indicated for adults according to

20 Utilization Management and InterQual criteria.  (Id.)

21      The RFS containing defendant Aguilera's request for surgical repair of plaintiff's

22 tympanic membrane described plaintiff's medical diagnosis as "large perforation of right TM."

23 (Id. at 39.)  The RFS also stated that plaintiff had significant hearing loss in his right ear.  (Id.)

24 The RFS described the services requested as, "ENT for surgical repair (tympanoplasty of right

25 TM." (Id.)  The RFS described the medical necessity of the surgery as follows:  45 y/o…large

26 perforation of R TM.  ENT Dr. Colombo requested audiogram be completed prior to developing

27 ////

28 ////

1   possible surgical repair/tympanoplasty."[5]  (Id.)

2       The RFS form contains a note which appears to address the rejection of defendant

3   Aguilera's request for surgery:  "Perforated TM adult chronic perforation and no acute otitis

4   media.  Not met."  (Id. at 39.)

5       In his declaration, defendant Aguilera states that from July 25, 2018, to August 25, 2018,

6   he did not see or treat plaintiff because plaintiff transferred to CMF's Mental Health Crisis Bed

7   Facility ("MHCBF") for treatment.  (ECF No. 71-3 at 5.)  During that one month period, plaintiff

8   was seen by physicians with MHCBF, including Dr. McAllister.  (Id.)

9       On July 25, 2018, plaintiff was seen by Dr. McAllister in the MHCBF.  (Id. at 41-43.)  Dr.

10  McAllister's notes state that plaintiff was admitted to MHCBF for stabilization of his mental

11  health condition and plaintiff denied any new issues.  (Id. at 41.)  In the section of the notes titled

12  "History of Present Illness," Dr. McAllister noted that plaintiff has a medical history of chronic

13  headaches with photophobia, phonophobia and reports that his mother suffers from migraines.

14  (Id.)  Dr. McAllister noted plaintiff's history of chronic perforated tympanic membrane.  (Id.)  He

15  further noted that the discharge resolved with medication and that the audiogram showed

16  moderated to severe hearing loss.  (Id.)  Dr. McCallister noted that plaintiff was referred by "PNP

17  to ENT, but that referral was denied."  (Id.)  Dr. McAllister indicated that plaintiff denied ear pain

18  and ear discharge presently.  (Id. at 44.)

19      In his declaration, defendant Aguilera states that from August 28, 2018, to February 1,

20  2019, defendant Aguilera did not see or treat plaintiff because plaintiff transferred from CMF to

21  Atascadero State Hospital for mental health treatment.  (Id. at 5.)

22      In his declaration, Dr. Aguilera states that on September 27, 2018, while at Atascadero,

23  plaintiff received a referral to an ENT specialist, Dr. Ian Murton, at Twin Cities Community

24  Hospital.  (Id. at 5.)  The form for this referral is dated August 31, 2018.  (Id. at 45.)  This form

25  describes plaintiff's "principal diagnosis" as "recurrent ear infection."  (Id.)  This form described

26  the need for the ENT referral as follows:

27  _____

28  [5]  Defendant Aguilera mistakenly requested surgery for plaintiff's right ear rather than plaintiff's
    left ear.

12

> Patient reported recurrent ear infection since July 2017.  He was on doxycyclin but it recurred.  Patient also reported perforated TM, 50% hearing loss but unable to visualized [sic] his TM due to his ear discharge.  Currently on Augmentin for 5 days but worsening pain, white milky discharge and no febrile episode.  Added cirpro otic drops and ibuprofen for pain.

(Id.)

On September 27, 2018, Dr. Murton recommended that plaintiff go to a tertiary hospital for repair of his tympanic membrane.[6]  (Id.)  Dr. Murton wrote, "Given the large size of the perforation, perhaps a marginal perforation, tortuous ear canal, I would recommend this be performed at a tertiary care by a tertiary care otologist due to the extensive nature of this."  (Id. at 47-48.)

In his declaration, defendant Aguilera states that on November 8, 2018, while still at Atascadero, plaintiff had a second consult with ENT Dr. Murton who recommended that plaintiff undergo a tympanoplasty at a tertiary hospital.  (Id. at 5.)  In his report from the second consult, Dr. Murton described the "chief complaint" as "left eardrum perforation, chronic otitis media and external hearing loss."  (Id. at 49.)  Dr. Murton wrote, "Recommend tertiary care referral for tympanoplasty given the extent of the perforation and more difficult anatomy, patient was in agreement with the plan for tympanoplasty, which I think will help significantly with conductive hearing loss and hopefully preclude further otitis and allow us to continue dry ear precautions."  (Id. at 50.)

In his declaration, defendant Aguilera states that on February 1, 2019, plaintiff returned to CMF from Atascadero State Hospital.  (Id. at 5.)

Attached to defendant Aguilera's declaration is an RFS form containing a request submitted by Dr. Onglad on January 24, 2019.  (Id. at 51.)  Dr. Onglad requested that plaintiff be seen by an ENT at a tertiary hospital.  (Id.) Dr. Onglad wrote that plaintiff had left TM perforation and was seen by ENT on November 8, 2018, who recommended that plaintiff be

---

[6]  A tertiary care center is a hospital or medical center for patients often referred from secondary care centers, which provides subspeciality expertise.  See https://medical-dictionary.thefreedictionary.com/tertiary+care+center.

referred to a tertiary hospital for tympanoplasty given the extent of the perforation.  (Id.)  This

request was approved on January 29, 2019.  (Id.)  Thus, it appears that officials at Atascadero

approved plaintiff's tympanoplasty surgery at a tertiary center just prior to plaintiff's return to

CMF.

In his declaration, defendant Aguilera describes plaintiff's care following February 1,

2019, until plaintiff transferred away from CMF:

> 29.  On February 19, 2019, CMF physician Dr. Ota spoke with Physician's Assistant Ingrid from Highland Hospital in Oakland, CA.  The PA said that Fairmont Hospital in nearby San Leandro, CA could do the audiogram for Singh prior to surgery unless Singh was experiencing drainage or an infection in the ear.  The PA further stated that Singh would be worse off if they performed the operation and an infection came back.  The plan was for Dr. Ota [to] see Singh, assess his ear and call the PA to discuss a plan.  (AG 44.)

> 30.  On February 26, 2019, Dr. Ota saw Singh in clinic at the request of PA Ingrid at Highland Hospital to make sure that Singh did not have an active infection before his surgery evaluation.  Dr. Ota noted that Singh had left otitis media in 2018 and was treated with doxycycline which failed and then with Augmentin.  Singh's left tympanic membrane had subsequently ruptured.  Dr. Ota further noted that Singh had an ENT consult on November 15, 2018 and it was recommended he be evaluated at a tertiary care center given the extent of the perforation.  In terms of the assessment and plan, Dr. Ota discussed with Singh his problem list, past medical history, recent lab work and medications.  Dr. Ota noted that all patient concerns were addressed with a clear understanding of the plan and effective communication was reached.  Dr. Ota indicated she would follow up as scheduled for chronic care management.  (AG 45-46.)

> 31.  From February 28, 2019 to March 29, 2019, I did not see or treat Singh because he transferred to CMF's MHCBF for treatment. During that one-month period, Singh was seen by physicians with MHCBF, including Dr. McAllister.

> 32.  On March 5, 2019, Dr. McAllister put in a Physician's RFS for Audiology and noted that Singh had been seen by an ENT at Highland Hospital in Oakland and that the ENT at Highland requested that the Audiogram be done at Fairmont Hospital in San Leandro.  (AG 47-48.)

> 33.  On March 29, 2019, Singh transferred to Mule Creek State Prison and was no longer under my care or the care of doctors at CMF.

> 34.  At all times in the course and scope of my duties, I treated Mr. Singh with professionalism and respect and to the best of my medical and professional abilities.  At no time did I do anything to withhold, prevent or delay Mr. Singh from receiving any treatment that was

14

medically necessary.  I treated his ear infection symptoms by prescribing appropriate medication and submitted multiple requests for audiology exams that were required before the tympanoplasty surgery could take place.  I submitted a Request for Services regarding the surgery by an ENT specialist in June 2018; but my request was rejected. Any delays in Mr. Singh's surgery were caused by his recurrent infections, which prevented surgery; his absence from CMF to receive treatment at the MHCBF and Atascadero State Hospital; and his failure to attend an audiology appointment.

(Id. at 6-7.)

B. Discussion

As observed by defendant Aguilera in the summary judgment motion, plaintiff makes two related claims against defendant Aguilera:  1) defendant Aguilera failed to property treat plaintiff's ear infection; and 2) defendant Aguilera did not arrange for timely visits with specialists to arrange for recommended surgery on plaintiff's perforated ear drum (left ear tympanoplasty).

In the summary judgment motion, defendant concedes that a question of fact exists as to whether plaintiff had a serious medical need associated with his left ear.  Defendant moves for summary judgment on the grounds that he did not act with deliberate indifference to plaintiff's alleged serious medical need.

1. Treatment of Plaintiff's Ear Infections

Defendant argues that the undisputed evidence shows multiple attempts by defendant to treat plaintiff's ear infection and pain with medication.

At the outset, the undersigned observes that plaintiff's opposition is not verified.

*June 21, 2017*

Defendant Aguilera argues that he did not act with deliberate indifference when he prescribed antibiotics to treat plaintiff's left ear infection on June 21, 2017.

In his opposition, plaintiff argues that on June 21, 2017, defendant Aguilera should have performed a specimen test of his ear infection.  (ECF No. 82 at 1.)  Plaintiff's opinion that defendant Aguilera should have performed a specimen test of his ear infection is not admissible. To be admissible, a layperson's opinion testimony must be founded on the witness's own perceptions and must not be based on "scientific, technical, or other specialized knowledge ...."

15

1    Fed. R. Evid. 701.  Plaintiff has no medical training sufficient to render his opinion admissible.

2         In his opposition, plaintiff also argues that defendant Aguilera "only prescribed a 5 day

3    course of Levulofloxin on June 21, 2017.  (ECF No. 82 at 1.)  Plaintiff is not qualified to render

4    an admissible opinion regarding the dosage and type of medication defendant Aguilera allegedly

5    failed to prescribe on June 21, 2017.  Fed. R. Evid. 701.

6         The undisputed evidence demonstrates that defendant Aguilera prescribed antibiotics for

7    plaintiff's ear infection on June 21, 2017.  Plaintiff offers no expert evidence demonstrating that

8    this treatment was improper.  Accordingly, based on this undisputed evidence, the undersigned

9    finds that defendant Aguilera did not act with deliberate indifference with regard to his treatment

10   of plaintiff's left ear on June 21, 2017.

11        *June 27, 2017*

12        As discussed above, in the June 27, 2017 medical records, defendant Aguilera noted that

13   plaintiff denied pain in his left ear and defendant Aguilera could see no discharge in the left

14   external auditory canal.  Defendant noted some whitish gel near the perforation of plaintiff's ear

15   drum.  Defendant referred plaintiff to an ENT for evaluation of his otitis media.  Defendant

16   argues that his treatment of plaintiff's ear on June 27, 2017, did not constitute deliberate

17   indifference.

18        In his opposition, plaintiff argues that on June 27, 2017, he was still experiencing pain and

19   discharge in his left ear.  (ECF No. 82 at 1.)  Plaintiff argues that defendant Aguilera's notes

20   "states the discharge and there is some whitish gel like material at perforation of eardrum."  (Id.)

21   Plaintiff argues that defendant failed to perform an ear swab.  (Id.)

22        Assuming the undersigned may consider the unverified allegation in plaintiff's opposition

23   that he experienced ear pain on June 27, 2017, the undersigned finds that this allegation does not

24   create a material dispute of fact regarding whether defendant Aguilera knew of plaintiff's ear pain

25   on June 27, 2017.  See Cape v. San Luis Obispo Sheriff Dept., 2022 WL 2308256, at * 4-5 (C.D.

26   Cal. June 1, 2022) (although the law is unclear, after reviewing the case law, the court is of the

27   view that the court may consider unsworn factual statements made by plaintiff in complaint and

28   concise brief based on personal knowledge that are admissible through his testimony at trial).

1    While plaintiff claims that he experienced ear pain on June 27, 2017, plaintiff does not

2    specifically allege in his opposition that he told defendant Aguilera that his left ear was still in

3    pain.  As discussed above, defendant Aguilera's notes state that plaintiff denied pain in his left ear

4    on June 27, 2017.  For these reasons, the undersigned does not find that plaintiff has created a

5    material dispute of fact regarding whether defendant Aguilera knew that plaintiff continued to

6    experience left ear pain on June 27, 2017.  See also Chima v. Obedoza, 2003 WL 21771927, at *1

7    (9th Cir. 2003) (finding claims by inmate that defendants failed to take his vital signs and

8    examine him were insufficient to demonstrate material issues of fact where inmate's "conclusory"

9    claims contradicted by his medical records) (citing United States v. Various Slot  Machines on

10   Guam, 658 F.2d 697, 701 (9th Cir. 1981) ("Even on a motion for summary judgment, a court is

11   not compelled to give weight to an allegation that is incontrovertibly demonstrated to be false.").

12   Plaintiff's claim in his opposition that his left ear still had discharge on June 27, 2017,

13   appears to be based on defendant Aguilera's note of "some whitish gel like material at perforation

14   of eardrum."  The medical records indicate that defendant Aguilera thought that the whitish gel

15   indicated that plaintiff still had an infection in his middle ear.  Because the middle ear infection

16   had not responded to antibiotics, defendant Aguilera referred plaintiff to an ENT specialist to

17   address this infection.  Plaintiff offers no expert evidence that the referral of plaintiff to an ENT

18   to address this middle ear infection was improper.  Plaintiff's opinion that on June 27, 2017,

19   defendant Aguilera should have performed an ear swab or prescribed antibiotics or some other

20   treatment for the infection/inflammation in his middle ear is inadmissible.  Fed. R. Evid. 701.

21   The undersigned finds that defendant Aguilera did not act with deliberate indifference on

22   June 27, 2017, by failing to treat plaintiff's ear infection in his left external auditory canal

23   because plaintiff no longer had symptoms of this infection.  The undersigned finds that defendant

24   Aguilera did not act with deliberate indifference on June 27, 2017, by referring plaintiff to an

25   ENT regarding his middle ear infection because this infection failed to respond to antibiotics.

26   *July 25, 2017*

27   Defendant argues that he did not act with deliberate indifference on July 25, 2017,

28   because the undisputed evidence demonstrates that, on that date, plaintiff reported that his ear felt

better and there was no drainage.  On that date, defendant noted plaintiff's pending ENT appointment. Plaintiff does not dispute this evidence.

Based on the undisputed evidence described above, the undersigned finds that defendant Aguilera did not act with deliberate indifference with regard to his treatment of plaintiff's left ear on July 25, 2017.

*August 22, 2017*

On August 22, 2017, defendant Aguilera saw plaintiff for a follow-up examination.  The record from this date does not mention ear pain or ear drainage.  The record discusses the treatment plan for plaintiff's ear.  In his opposition, plaintiff does not argue that defendant Aguilera acted with deliberate indifference on August 22, 2017.

Based on the undisputed evidence described above, the undersigned finds that defendant Aguilera did not act with deliberate indifference with regard to his treatment of plaintiff's left ear on August 22, 2017.

*November 30, 2017, and February 15, 2018*

Defendants argue that the undisputed evidence shows that from November 2017 through February 2018, plaintiff focused on the issue of hyperpigmentation near his left eye and had no complaints regarding his left ear.  In his opposition, plaintiff does not dispute this argument.

The undersigned finds that the medical records from defendant Aguilera's meetings with plaintiff on November 30, 2017, and February 15, 2018, did not address plaintiff's left ear problems.  Accordingly, the undersigned finds that defendant Aguilera did not act with deliberate indifference with regard to his treatment of plaintiff's left ear on November 30, 2017, and February 15, 2018.

*April 17, 2018*

As discussed above, defendant Aguilera's notes from the April 17, 2018 examination state that plaintiff complained of foul smelling left ear discharge.  Defendant Aguilera found no discharge and no evidence of "active otitis media issue with perforated TM."   Based on this evidence, defendant argues that he did not act with deliberate indifference in his treatment of plaintiff's left ear on April 17, 2018.

In the opposition, plaintiff argues that defendant Aguilera failed to treat his ear infection on April 17, 2018.  Plaintiff contends that on April 10, 2018, he was seen by RN Valera who noted a foul smelling discharge in plaintiff's left ear and referred plaintiff to a doctor for treatment.  (ECF No. 82 at 10 (notes by RN Valera).)  In his opposition, plaintiff alleges that on April 17, 2018, defendant Aguilera noticed the foul smelling discharge but chose not to do anything about it and let plaintiff suffer in pain.  (Id. at 3.)  Plaintiff contends that on April 26, 2018, Dr. Osman prescribed antibiotics after noticing left ear discharge and pain.  Plaintiff provides medical records demonstrating that on April 26, 2018, Dr. Osman diagnosed plaintiff with "left otitis externa" and prescribed antibiotics.  (Id. at 14.)

For the following reasons, the undersigned finds that plaintiff has not created a disputed material fact regarding whether he had an ear infection on April 17, 2018.

Admittedly, on April 10, 2018, Nurse Valera noticed a foul smelling discharge in plaintiff's left ear.  However, seven days later, defendant Aguilera's notes from April 17, 2018, state that plaintiff's ear had no discharge at that time.  Plaintiff's conclusory and unsupported allegation in his opposition that defendant Aguilera noticed the foul smelling discharge on April 17, 2018, contradicted by the medical record, is insufficient to demonstrate the existence of a material issue of fact.  Chima v. Obedoza, 2003 WL 21771927, at *1 (9th Cir. 2003) (finding claims by inmate that defendants failed to take his vital signs and examine him were insufficient to demonstrate material issues of fact where inmate's "conclusory" claims contradicted by his medical records) (citing United States v. Various Slot Machines on Guam, 658 F.2d 697, 701 (9th Cir. 1981) ("Even on a motion for summary judgment, a court is not compelled to give weight to an allegation that is incontrovertibly demonstrated to be false.").

The undersigned acknowledges that Dr. Osman diagnosed plaintiff with left otitis externa on April 26, 2018.  Defendant Aguilera's notes from April 17, 2018, found no left otitis media and did not mention left otitis externa.  Based on defendant Aguilera's failure to discuss left otitis externa in his notes from the April 17, 2018 examination, it is reasonable to infer that plaintiff did not have left otitis externa on this date.  Plaintiff presented no expert evidence demonstrating that he must have had left otitis externa on April 17, 2018, based on his diagnosis with this condition

1   on April 26, 2018.

2   The undisputed evidence demonstrates that defendant Aguilera did not find that plaintiff

3   had an active ear infection on April 17, 2018.  For this reason, the undersigned finds that

4   defendant Aguilera did not act with deliberate indifference by failing to provide treatment for an

5   ear infection on that date.

6   *May 17, 2018*

7   Defendant contends that the undisputed evidence shows that on May 17, 2018, he

8   obtained a swab of drainage to test for infection and started plaintiff on ciprofloxacin to address

9   possible pseudomonas.  Defendant argues that this evidence demonstrates that he did not act with

10  deliberate indifference on May 17, 2018.  In his opposition, plaintiff does not dispute defendant's

11  evidence and claims regarding the May 17, 2018 examination.

12  Based on the evidence demonstrating that on May 17, 2018, defendant obtained a swab of

13  drainage to test for infection and started plaintiff on ciprofloxacin, the undersigned finds that

14  defendant Aguilera did not act with deliberate indifference with regard to his treatment of

15  plaintiff's left ear on May 17, 2018.

16  *May 31, 2018, and June 18, 2018*

17  Defendant's evidence demonstrates that on May 31, 2018, defendant Aguilera saw

18  plaintiff for a follow-up where plaintiff reported significant improvement of his ear and that he

19  had no drainage or pain.  Defendant's evidence demonstrates that on June 18, 2018, defendant

20  Aguilera saw plaintiff for a follow-up where plaintiff reported no ear pain.  Defendant Aguilera

21  did not provide plaintiff with further treatment for his left ear at this appointment apparently

22  because plaintiff's symptoms had improved.

23  In his opposition, plaintiff does not dispute defendant's evidence regarding the May 31,

24  2018, and June 18, 2018 follow-up examinations.

25  Based on the undisputed evidence demonstrating that defendant Aguilera did not provide

26  further treatment for plaintiff on May 31, 2018, and June 18, 2018, because plaintiff's symptoms

27  had improved, the undersigned finds that defendant Aguilera did not act with deliberate

28  indifference regarding his treatment of plaintiff's left ear on those dates.

20

1          2.   Facilitation of Plaintiff's Treatment and Surgery

2          Defendant contends that there is no evidence that he intentionally delayed or interfered

3   with plaintiff's prescribed treatment.  Defendant contends that after prescribing medication to

4   treat plaintiff's ear infection and arranging for multiple necessary audiology visits, the last action

5   defendant took with respect to plaintiff was to recommend plaintiff's surgery.  Defendant argues

6   that, based on these facts, plaintiff cannot claim that defendant acted with deliberate indifference

7   to his ear pain or that he intentionally delayed his surgery.

8          For the following reasons, the undersigned denies defendant Aguilera's summary

9   judgment motion regarding plaintiff's claim that he delayed plaintiff's treatment.

10         First, the undersigned cannot determine whether defendant Aguilera acted with deliberate

11  indifference when he waited seven months to request a new audiogram after plaintiff failed to

12  attend the audiogram scheduled for September 18, 2017.  Plaintiff needed to have the audiogram

13  before receiving surgery.

14         The reasons for plaintiff's failure to attend the September 18, 2017 audiogram are

15  disputed.  The record contains evidence showing that plaintiff refused to attend the appointment

16  because he wanted to discuss the matter further with his primary care physician, i.e., defendant

17  Aguilera.  The record also contains evidence that plaintiff did not attend the appointment because

18  he was not well.

19         Even if plaintiff refused to attend the audio appointment because he wanted to discuss the

20  matter further with defendant Aguilera, defendant does not address why it took seven months for

21  him to request a new audiogram appointment.  Even if plaintiff failed to raise the issue of the

22  need for a rescheduled audiogram at the November 30, 2017, and February 15, 2018

23  appointments, defendant does not address why he, defendant Aguilera, did not raise this issue at

24  these appointments.  It is also unclear if defendant Aguilera was required to physically examine

25  plaintiff prior to submitting an RFS form for the renewed audiogram appointment.

26         Without knowing why it took defendant Aguilera seven months to submit an RFS form

27  for plaintiff's renewed audiogram appointment, the undersigned cannot determine whether

28  defendant's delay in submitting this form amounted to deliberate indifference.  McGuckin, 974

1  F.2d at 1060 (a delay in medical treatment that causes further harm violates the Eighth

2  Amendment).  Accordingly, defendant Aguilera's motion for summary judgment as to this claim

3  is denied.

4       Second, for the reasons stated herein, the undersigned cannot determine whether

5  defendant Aguilera acted with deliberate indifference by failing to resubmit an RFS for surgical

6  repair of plaintiff's tympanic membrane.

7       As discussed above, on June 18, 2018, defendant Aguilera submitted an RFS for plaintiff

8  to be seen by ENT specialist Dr. Colombo at San Joaquin General Hospital for surgical repair of

9  his tympanic membrane.  In his declaration, defendant Aguilera states that on June 20, 2018, the

10  Chief Medical Executive denied this request because tympanoplasty is not medically indicated for

11  adults according to Utilization Management and InterQual criteria.  However, as discussed above,

12  the notes denying the request suggest that the request was denied because plaintiff was an adult

13  *and* because plaintiff did not have acute otitis media with the perforated tympanic membrane.  In

14  the June 18, 2018 RFS, defendant Aguilera did not mention plaintiff's "recurrent left otitis

15  media."  (ECF No. 71-3 at 27 (defendant Aguilera's notes from April 17, 2018 examination.)

16       It is unclear if "acute otitis media" is different from the recurrent otitis media mentioned

17  in defendant Aguilera's April 17, 2018 notes.  However, the record suggests that defendant

18  Aguilera's may have been able to resubmit the RFS with additional information regarding

19  plaintiff's recurrent otitis media, which would have met the requirements for approval of the

20  surgery.  Defendant does not address this matter.

21       The undersigned also observes that Dr. Onglad's request for plaintiff's surgery was

22  approved while plaintiff was at Atascadero.  It appears that following plaintiff's return to CMF

23  from Atascadero, prison officials at CMF also planned for plaintiff to receive the surgery.  In

24  other words, plaintiff was authorized to have the surgery while housed at CMF.  These

25  circumstances also suggest that defendant Aguilera could have resubmitted a new RFS for

26  plaintiff's surgery with additional information.

27       Without further information regarding why defendant Aguilera failed to resubmit the RFS

28  for plaintiff's surgery with additional information regarding plaintiff's recurrent otitis media, the

undersigned cannot determine whether defendant Aguilera acted with deliberate indifference by failing to resubmit the RFS.  McGuckin, 974 F.2d at 1060 (a delay in medical treatment that causes further harm violates the Eighth Amendment).  Accordingly, defendant Aguilera's motion for summary judgment as to this claim is denied.

3.   New Claims

As observed by defendant Aguilera in the reply, plaintiff's opposition raises new claims.  Plaintiff alleges that defendant Aguilera failed to prescribe a cotton ball at an August 22, 2017 appointment.  (ECF No. 82 at 2.)  Plaintiff also alleges that defendant Aguilera retaliated against him for filing a grievance.  (Id.)

In the reply, defendant argues that plaintiff did not administratively exhaust his claim regarding defendant's failure to prescribe a cotton ball.  (ECF No. 83 at 4.)  Defendant also argues that the two new claims raised in plaintiff's opposition are without merit.  (Id. at 4-6.)

Plaintiff may not amend his complaint to include new claims by way of his opposition to defendants' summary judgment motion.  Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006).  Accordingly, to the extent plaintiff's opposition raises new claims for which he seeks relief, the undersigned will not address these new claims.

V.   Summary Judgment Motion on Behalf of Defendants' Ullery and Vaughn

A.   Defendant Ullery

Defendants argue that defendant Ullery did not intentionally delay or deny plaintiff's access to medical care.  In support of this argument, defendants rely primarily on the declaration of defendant Ullery and the attached medical records.  The undersigned sets forth this evidence herein.

*Defendants' Evidence Regarding Defendant Ullery*

In his declaration, defendant Ullery states that plaintiff transferred from CMF to MCSP on March 29, 2019.  (ECF No. 87-3 at 2.)  Defendant Ullery saw plaintiff as a patient between April 2019 and December 2019.  (Id.)  Defendant Ullery stopped seeing plaintiff as a patient based on the numerical method of assignment of inmate-patients to physicians.  (Id.)  After December 2019, defendant Ullery did not see plaintiff as a patient, nor was he involved in plaintiff's

23

1   treatment plan or medical decisions regarding plaintiff's left ear.  (Id.)

2            On April 3, 2019, defendant Ullery saw plaintiff for an initial consultation regarding his

3   perforated left tympanic membrane and several episodes of otitis media.  (Id.)  Defendant Ullery

4   states in his declaration, "The records I reviewed prior to the appointment showed that [plaintiff]

5   had been treated with antibiotics, had cultures and according to the notes had seen ear nose and

6   throat consultants twice; although I could not find the consultive notes from the ENT."  (Id. at 2-

7   3.)  Defendant Ullery states, "[Plaintiff] stated that he was told that his perforated tympanic

8   membrane needed repair at a tertiary care center and that a referral was in process when he was

9   transferred."  (Id. at 3.)  "[Plaintiff] stated that he had significant hearing loss on the left side

10  although there was no pain or drainage at this appointment."  (Id.)  Plaintiff told defendant Ullery

11  that he used cotton balls with a small amount of Vaseline for showering and stated that prevented

12  further infection.  (Id.)

13           Defendant Ullery states that, in terms of his assessment and plan, he was unable to

14  examine the perforated tympanic membrane due to cerumen impaction (excessive buildup of ear

15  wax).  (Id.)  Defendant Ullery states, "As [plaintiff] was seen by the ENT at San Joaquin General

16  Hospital (San Joaquin), I contacted the offsite coordinator to obtain the ENT's consultative notes

17  so I could determine the next best step."  (Id.)  Defendant Ullery states that it was clear that

18  plaintiff needed to have the cerumen removed by a suction apparatus in order to further evaluate

19  the tympanic membrane.  (Id.)  Defendant Ullery states, "Based on previous notes from

20  [plaintiff's] primary care physicians and my discussion with him at this appointment, I planned to

21  evaluate the need to submit a tertiary referral and arranged a follow up chronic care appointment

22  in three months."  (Id.)  Defendant Ullery states, "After further reviewing the records, I instructed

23  RN Rosamond Navarrete to send [plaintiff] back to the ENT at San Joaquin for cerumen removal

24  and reexamination for appropriate referral to a tertiary care center."  (Id.)

25           On April 17, 2019, defendant Ullery saw plaintiff after he refused to see the ENT at San

26  Joaquin on April 16 for cerumen removal and reexamination.  (Id.)  Plaintiff told defendant

27  Ullery that he did not wish to go to San Joaquin General Hospital and therefore chose to refuse

28  the appointment.  (Id.)  Plaintiff presented at this appointment "wondering if [defendant] could

examine his ears and remove the cerumen and subsequently refer him to a tertiary care center since that would have been more convenient for him." (Id.)  Defendant Ullery reminded plaintiff that the general medical staff will not remove the cerumen impactum either manually or with water irrigation in the presence of a reported large tympanic membrane rupture as this risked further damage and injury.  (Id.)  Defendant Ullery reminded plaintiff that he needed to be seen by a local ENT provider to have the cerumen removed using a microscopic suction apparatus possibly followed by pictures and subsequent referral to a tertiary care center.  (Id.)  Defendant Ullery states that this had been previously discussed but plaintiff was not happy with that result because he did not wish to go to San Joaquin General Hospital.  (Id.)  However, plaintiff agreed to repeat the Request for Services and understood that it could take several weeks to be seen.  (Id. at 3-4.)  Defendant Ullery states that plaintiff was not in any distress at this April 17, 2019 appointment.  (Id. at 4.)

On May 10, 2019, defendant Ullery saw plaintiff for follow-up.  (Id.)  "[Plaintiff] questioned the upcoming ENT appointment, but understood that it could be at San Joaquin and that he needed to go to the appointment to have cerumen removal and evaluation as to whether or not he truly had a tympanic membrane rupture that would require a tertiary care referral."  (Id.)  Defendant Ullery states that plaintiff reluctantly agreed to go.

Defendant Ullery saw plaintiff for a chronic care follow-up on July 1, 2019.  (Id.)  Plaintiff stated that he used mineral oil to remove a significant amount of wax from his ear canal.  (Id.)  Defendant Ullery noted that plaintiff was scheduled for an audiogram and follow-up with the ENT.  (Id.)  Plaintiff stated that the hearing in his left ear may have improved slightly.  (Id.)

On July 3, 2019, San Joaquin called the institution to inform them that the audiologist was not available due to an emergency and that it would reschedule plaintiff's audiology appointment prior to the ENT consultation.  (Id.)

On July 23, 2019, plaintiff underwent audiology testing at San Joaquin General Hospital.  (Id.)  There was moderate to severe hearing loss in both ears.  (Id.)  The audiologist could not visualize the tympanic membrane due to a tortuous ear canal and hair in the left ear.  (Id.)  However, the test results were consistent with tympanic membrane perforation.  (Id.)  The

audiologist recommended a follow up with the ENT and additional audiology testing as needed. (Id.)

On July 30, 2019, plaintiff refused to go to the recommended ENT follow up at San Joaquin because he said he was told that he would be going to a tertiary facility.  (Id.)  RN Brittsan educated plaintiff that he needed to be seen by the ENT specialist before going to the tertiary doctor.  (Id. 4-5.)  Plaintiff was also educated about the importance of going to his scheduled appointments and working with his treatment team's plan.  (Id. at 4.)  Plaintiff continued to refuse, insisted he would not go and told RN Brittsan that he would talk to defendant about it.  (Id.)  RN Brittsan noted that plaintiff signed a refusal form and she scheduled plaintiff's follow-up appointment with defendant.  (Id.)

On August 13, 2019, defendant Ullery saw plaintiff to discuss his refusal to go to the local ENT on July 30, 2019 (after previously refusing to go on April 16).  (Id.)  Defendant Ullery states that plaintiff was insistent that he wanted to be seen only at UC Davis or Highland Hospital.  (Id.) Defendant Ullery states, "It had been explained to him previously, in detail, to his understanding, that he needed to see the local ENT for examination before referral to a tertiary care center."  (Id.) Defendant Ullery states, "Plaintiff was upset because the tertiary referral was approved for him at CMF."  (Id.)  Defendant Ullery noted that plaintiff completed a recent hearing test and brought in paperwork from a previous ENT consultative visit stating that he should be using a cotton ball with Vaseline prior to showering, which I approved.  (Id.)  Plaintiff denied any new trauma or symptoms at this appointment.  (Id.)

Defendant Ullery states, "Based on my training and experience, it was still unclear if [plaintiff] actually required surgery."  (Id.)  "Larger tears often require a patch and indeed may need to be performed at a tertiary referral center."  (Id.)  "However, having had recent cerumen impaction removed using mineral oil and having completed the hearing test again, I impressed upon him the need to see the local ENT doctor for a complete fiberoptic examination to determine whether surgery was indicated and whether that surgery could be provided locally or would require referral to a tertiary care center."  (Id.)  Defendant Ullery states, "I understood that [plaintiff] was approved to be examined at a tertiary care referral center while at CMF."  (Id.)

26

Defendant Ullery states, "I tried to understand why he continually refused to be seen locally first, but he really had no explanation other than his continued statement that he only wanted to be seen at a tertiary care center." (Id.)  After that discussion, plaintiff agreed to be seen by a local ENT doctor.  (Id.)

On August 13 and 14, 2019, defendant Ullery exchanged emails with defendant Chief Physician and Surgeon Dr. Wesley Vaughn where they discussed plaintiff's refusal to see the ENT at San Joaquin before being approved to go to a tertiary hospital.  (Id.)  Defendant Ullery asked defendant Dr. Vaughn if plaintiff had the ability, based on the previous ENT evaluation, to go directly to Highland Hospital for evaluation.  (Id.)  Defendant Ullery informed defendant Vaughn that "we" had been pushing to have the ENT at San Joaquin look at it first since plaintiff recently changed facilities to Mule Creek.  (Id. at 5-6.)  Defendant Ullery told defendant Vaughn that plaintiff had twice refused the local ENT visits stating that he only wanted to be seen at UC Davis or Highland.  (Id. at 6.)  Defendant Ullery states that defendant Vaughn informed him that the Utilization Management Committee stated that the tertiary referral required a Letter of Authorization, which would not happen until after plaintiff was first seen by a local provider.  (Id.)  Defendant Ullery and defendant Vaughn made sure that plaintiff was aware of the risks of refusing ENT referrals, including further hearing loss, severe infection or death.  (Id.)

A copy of defendant Vaughn's August 14, 2019 email informing defendant Ullery that plaintiff had to first be seen by a local provider is attached as an exhibit to defendants' summary judgment motion. (ECF No. 87-5 at 26.)

As plaintiff agreed to be seen by the local ENT at the August 13, 2019 appointment, a Request for Services was submitted on September 3, 2019.  (ECF No. 87-3 at 6.)

On September 30, 2019, defendant Ullery saw plaintiff for follow up after he refused a third time to see the local ENT.  (Id.)  This appointment was a co-consultation with RN Lisa Davis.  (Id.)  Plaintiff appeared at this appointment with increased pain and drainage from his left ear, but no fever.  (Id.)  Plaintiff had been using cotton balls and Vaseline to take showers and believed he had irritated his ear canal.  (Id.)  A physical examination revealed what appeared to be otitis externa.  (Id.)  Defendant Ullery also found that, "[plaintiff] appeared to have a chronic

perforated tympanic membrane although only the edge could be visualized." (Id.)  Defendant

Ullery directed that plaintiff be treated with oral antibiotics and recommended that plaintiff go

back to see the ENT specialist.  (Id.)  Defendant Ullery states that plaintiff was argumentative and

said that since he went out to have the hearing test, he should be seen at a tertiary center.  (Id.)

Defendant Ullery states, "Although [plaintiff] may have ultimately been right in the need to be

seen at a tertiary care referral center, he needed to first be evaluated by a local ENT to confirm

the medical necessity of the tertiary care referral."  (Id.)  Defendant Ullery states that this had

been explained to plaintiff multiple times.  (Id.)  Defendant Ullery states that plaintiff understood

that if he would have gone out to the ENT as recommended some months ago, his ear issues

would have already been managed.  (Id.)  Defendant states, "In other words, by refusing the ENT

visits, [plaintiff] was continually delaying the problem himself."  (Id.)  Plaintiff promised to go

out to the ENT so that the tympanic membrane could be evaluated by a specialist as his issue

could not be treated at MCSP.  (Id.)

On October 1, 2019, plaintiff was seen for evaluation by Dr. Robert Gray, the ENT

specialist at San Joaquin General Hospital.  (Id. at 7.)  Dr. Gray reported a purulent infection in

plaintiff's left ear which had to be treated with antibiotics (Floxin) fourteen days before surgery

could be considered.  (Id.)  Dr. Gray ordered follow up in one month and stated that the

perforated eardrum would need evaluation and repair once drainage had stopped to better evaluate

the ossicles involvement.  (Id.)  Ossicles are three small bones in the middle ear and the condition

of those bones would, in part, determine the need for a tertiary care referral.  (Id.)

On October 31, 2019, RN James McCrory notified plaintiff of the upcoming ENT consult

with Dr. Gray at San Joaquin.  (Id.)  Plaintiff stated that he would neither refuse nor cancel the

appointment, which was needed to confirm the medical necessity of a tertiary care referral.  (Id.)

On November 5, 2019, plaintiff refused for the fourth time to go to San Joaquin General

Hospital, stating as he did before that he would not go to San Joaquin and that he wanted to be

seen in the tertiary care referral center.  (Id.)  RN Brittsan informed plaintiff of the risks of not

going to the ENT appointment, up to and including death, but plaintiff continued to refuse.  (Id.)

On December 18, 2019, defendant Ullery saw plaintiff for follow-up and noted his chronic

perforated tympanic membrane and his repeated refusal to see the ENT at San Joaquin General

Hospital, which was necessary to confirm the need for a tertiary referral center referral.  (Id.)

When plaintiff was last seen by ENT Gray, it was recommended that plaintiff receive Cipro drops

to decrease the amount of drainage and come back for repeat examination so that Dr. Gray could

evaluate the ossicles involvement and make a determination as to a possible surgical

management.  (Id.)  Plaintiff refused to be seen by Dr. Gray a second time stating that he wanted

to go to a tertiary care center even though Dr. Gray had not necessarily advised surgery.  (Id.)  At

this appointment, plaintiff stated that his symptoms were the same with decreased hearing out of

the left side.  (Id.)  Plaintiff asked about receiving hearing aids.  (Id.)

Defendant Ullery states that in terms of assessment and plan, he noted that plaintiff had

been noncompliant with his ENT follow-up appointments despite multiple recommendations and

many visits with defendant Ullery as well as nursing staff to attempt to encourage compliance

with medical recommendations.  (Id.)  Defendant Ullery states that plaintiff's symptoms at this

appointment were much the same and a hearing aid with a perforated tympanic membrane was

not likely to be of benefit if he needed surgery.  (Id.)  In his declaration, defendant Ullery states

that his plan was to email an off-site coordinator to see if plaintiff could preferentially be seen at

Highlands Hospital instead of the local ENT for further evaluation.  (Id.)

Due to the system of assigning inmate-patients to medical providers, plaintiff was no

longer defendant Ullery's patient after the December 18, 2019 appointment.  (Id.)

Plaintiff was seen by ENT specialist Dr. Klosterman at Highlands Hospital on February

19, 2020.  (Id.)  Defendant Ullery states that it is his understanding that due to COVID-19

restrictions, plaintiff was not able to have his surgery in 2020.  (Id.)

Defendant Ullery states that he is familiar with plaintiff's treatment during the second half

of 2021 based on his review of plaintiff's records in relation to plaintiff's request for a court order

to have surgery at UCSF.  (Id.)  On June 15, 2021, plaintiff was seen by Dr. James Yee for

surgical consultation and evaluation.  (Id.)  Dr. Yee is a Board-certified otolaryngologist in

Folsom, California.  (Id.)  Dr. Yee ordered a CT maxillofacial scan and discussed indications for

a left-sided tympanoplasty, possible stapedectomy (surgery to remove a small bone, called the

1  stapes, from the middle ear) or mastoidectomy (surgery to remove cells in the hollow, air-filled

2  space in the skull behind the ear within the mastoid bone).  (Id.)  Dr. Yee indicated that plaintiff

3  could consider stapedectomy in the future if the tympanoplasty was successful.  (Id.)  Dr. Yee

4  further advised plaintiff to see a dentist for an infected tooth and ordered ten days of the antibiotic

5  medication Augmentin.  (Id. at 8-9.)  Dr. Yee scheduled plaintiff to return in six weeks for a

6  repeat CT and H & P (history and physical) to prepare for a left tympanoplasty.  (Id. at 9.)

7  On July 21, 2021, plaintiff was seen for follow-up care by his primary care doctor, Dr.

8  Vasuki Daram.  (Id.)  Dr. Daram noted that plaintiff wanted to be seen at UCSF because plaintiff

9  thought the treatment proposed by Dr. Yee was different from the treatment proposed by Dr.

10  Klosterman at Highland Hospital.  (Id.)  Plaintiff insisted on a third opinion (Dr. Klosterman, Dr.

11  Yee and UCSF); thus, Dr. Daram placed the referral for UCSF.  (Id.)

12  On July 26, 2021, RN Navarette spoke with Dr. Yee who confirmed that he could do the

13  tympanoplasty and partial OCR (ossicular chain reconstruction or middle ear bone surgery) as

14  recommended by Dr. Klosterman at Highland Hospital.  (Id.)  RN Navarette notified Chief

15  Physician and Surgeon Dr. Ashe.  (Id.)  Per Dr. Ashe's direction, plaintiff was referred back to

16  Dr. Yee for the procedure, as there was no need for a tertiary care referral.  (Id.)

17  Defendant Ullery states that based on his review of the records and knowledge of the

18  treatment plan, he can confirm that Dr. Yee is able to perform the OCR at the same time as the

19  tympanoplasty; and that the hospital where Dr. Yee will perform the surgeries is properly

20  equipped to perform both surgeries at the same time.  (Id.)  Defendant Ullery states that when he

21  was in private practice, he referred complex ENT surgeries for Dr. Yee for consultation, including

22  tympanoplasty and OCR.  (Id.)

23  On September 22, 2021, RN Steven Thor spoke with UCSF Otology about referring

24  plaintiff.  (Id.)  UCSF indicated that it was not taking incarcerated patients at that time.  (Id.)  RN

25  Thor informed RN Navarette and Dr. Daram of the same.  (Id.)  As of November 24, 2021, UCSF

26  was still not taking incarcerated patients.  (Id.)

27  Defendant Ullery states that under California Correctional Health Care Services policy,

28  inmates may not be selective in the choice of contracted providers.  (Id.)  In defendant's opinion,

1   Dr. Yee's treatment plan and skill level will meet, if not exceed, the standard of care for treating
2   patients with plaintiff's injuries.  (Id.)

3       *Discussion*

4       In the summary judgment motion, defendants concede that a question of fact exists as to
5   whether plaintiff had/has a serious medical need associated with his left ear.  Defendants argue
6   that defendant Ullery is entitled to summary judgment because he did not act with deliberate
7   indifference to plaintiff's alleged serious medical need.  Defendants argue that the undisputed
8   evidence shows that defendant Ullery's treatment plan was designed to confirm the need for
9   surgery by sending plaintiff to a local ENT who could evaluate whether it was medically
10  necessary for the surgery to occur at a tertiary facility.  Defendants contend that at no point did
11  defendant Ullery tell plaintiff that he could never go to a tertiary center.  Defendants argue that
12  there is no evidence that defendant Ullery intentionally delay or denied plaintiff access to medical
13  care or intentionally interfered with prescribed treatment.

14      In his opposition, plaintiff argues that the evidence demonstrates that defendant Ullery
15  failed to follow the previous ENT reports and recommendations, the audiologist reports as well as
16  the approval of Dr. Ota's request for his surgery.  Plaintiff argues that defendant Ullery ignored
17  this information, which was available at the April 3, 2019 examination.  Plaintiff alleges that
18  defendant Ullery caused the delay of his surgery, which resulted in further pain, suffering and
19  injury to plaintiff.

20      For the reasons stated herein, the undersigned finds that defendant Ullery did not act with
21  deliberate indifference when he referred plaintiff to the ENT at San Joaquin General Hospital on
22  April 3, 2019, April 17, 2019, May 10, 2019, and July 1, 2019.  At the outset, the undersigned
23  clarifies what defendant Ullery knew about plaintiff's left ear on these dates.

24      It appears that on April 3, 2019, defendant Ullery knew that CMF officials had referred
25  plaintiff to a tertiary care provider for surgical repair of his ruptured tympanic membrane.
26  Although defendant Ullery apparently did not have Dr. Murton's notes, plaintiff told defendant
27  Ullery about the planned surgery during the appointment and this information would have been
28  reflected in notes from plaintiff's primary care providers at CMF, which defendant Ullery says he

31

reviewed.  After the April 3, 2017 examination, Dr. Ullery ordered the consultive notes from the ENT at San Joaquin General Hospital.  While defendant Ullery does not identify the ENT from San Joaquin General Hospital whose notes he reviewed, it appears that these notes must have been the notes made by Dr. Colombo from her examination of plaintiff in 2017.  The record contains no evidence demonstrating that plaintiff was seen by another ENT at San Joaquin Hospital after Dr. Colombo's 2017 examination.  As discussed above, in 2017, defendant Colombo indicated that plaintiff's surgery could be performed at San Joaquin County Hospital.

In his declaration, defendant Ullery states that following the April 3, 2019 examination, after further review of the records, including the consultive notes from the ENT at San Joaquin General Hospital, he referred plaintiff back to the ENT at San Joaquin General Hospital for "reexamination for appropriate referral to a tertiary care center."

The undersigned finds that defendant Ullery did not act with deliberate indifference when he referred plaintiff back to San Joaquin General Hospital on April 3, 2017, April 17, 2019, May 10, 2019, and July 1, 2019, for reexamination of plaintiff's need for a referral to a tertiary center for surgery *because* Dr. Colombo's 2017 notes indicated that plaintiff's surgery could be performed at San Joaquin General Hospital.  While it was apparently later determined that plaintiff's surgery could not be performed at San Joaquin General Hospital, this circumstance does not mean that defendant Ullery acted with deliberate indifference when he made the initial referral.

The undersigned also observes that the record contains no evidence demonstrating that CMF officials determined that plaintiff's surgery could not be performed at San Joaquin General Hospital after obtaining Dr. Murton's recommendations that plaintiff be sent to a tertiary center for surgery.  The record indicates that CMF officials continued the plan made by officials at Atascadero for plaintiff to have surgery at a tertiary center.  The failure of CMF officials to reconsider whether plaintiff's surgery could be performed at San Joaquin General Hospital does not mean that defendant Ullery acted with deliberate indifference by referring plaintiff back to San Joaquin General Hospital, when records existed indicating that the surgery could be performed at San Joaquin General Hospital.

The undersigned further finds that defendant Ullery did not act with deliberate indifference by failing to refer plaintiff to a tertiary center on August 13, 2019, and September 30, 2019.  After plaintiff refused to go to the ENT and requested to go directly to Highland Hospital, on August 13, 2019, defendant Ullery contacted defendant Vaughn, the Chief Physician and Surgeon, to see if plaintiff could go directly to Highland Hospital.  Defendant Vaughn informed defendant Ullery of the Utilization Management Committee requirement that plaintiff be seen locally before referral to a tertiary care center.  Based on this information, defendant Ullery continued to refer plaintiff to the local provider, i.e., San Joaquin General Hospital.  Based on these circumstances, defendant Ullery's continued referral of plaintiff to San Joaquin General Hospital was not deliberate indifference.

As discussed above, on December 18, 2019, after plaintiff's repeated refusals to attend the ENT appointment at San Joaquin General Hospital, defendant Ullery decided to email an off-site coordinator to see if plaintiff could be seen preferentially at Highland Hospital.  It appears that this request was granted, as plaintiff was seen at Highland Hospital on February 19, 2020.

The undersigned does not find that defendant Ullery's failure to make the request to the off-site coordinator earlier constituted deliberate indifference.  In the August 2019 email exchange, defendant Vaughn informed defendant Ullery that plaintiff could not go directly to Highland Hospital.  Only after plaintiff continued to refuse to attend the appointments at San Joaquin General Hospital did defendant Ullery reach out to the off-site coordinator.  Based on these circumstances, the undesigned finds that defendant's failure to reach out to the off-site coordinator earlier did not constitute deliberate indifference.

The undersigned also finds that plaintiff's repeated refusal to attend the ENT appointments at San Joaquin General Hospital contributed to the delay in surgical treatment of his left ear.  Plaintiff refused to attend three ENT appointments at San Joaquin General Hospital before finally seeing ENT specialist Dr. Gray on October 1, 2019.  Had plaintiff gone to the first ENT appointment scheduled by defendant Ullery at San Joaquin General Hospital, plaintiff could have received treatment for his left ear much sooner.  Plaintiff cannot attribute to defendant Ullery the delays plaintiff caused by failing to attend these appointments.  See Cano v. Taylor,

33

739 F.3d 1214, 1218 (9th Cir. 2014) (granting summary judgment in part because there were

multiple documented refusals by the plaintiff to take his medication in the record); cf. Yoon v.

Hickman, 171 F. App'x 541, 541 (9th Cir. 2006) (finding that delays in dental treatment were, in

part, attributable to the plaintiff's refusal to show up for five scheduled appointments).

       For the reasons discussed above, the undersigned finds that defendant Ullery is entitled to

summary judgment.

       However, the undersigned is puzzled by defendant Ullery's statement in his declaration

that on August 13, 2019, it was still unclear to him if plaintiff actually required surgery.  As

discussed above, when plaintiff arrived at MCSP, ENT specialists Dr. Murton and Dr. Colombo

had recommended that plaintiff receive tympanoplasty surgery.  Prior to his transfer to MCSP,

officials at CMF were moving forward with plaintiff's surgery.  However, defendant Ullery did

not deny plaintiff's request for surgery and nor did he refuse to send plaintiff to the ENT at San

Joaquin General Hospital to evaluate whether the surgery could be performed locally.  Had

defendant Ullery disregarded the recommendations of the ENT specialists that plaintiff required

surgery, then this action may have had a different outcome.[7]

       Finally, the undersigned is also troubled by plaintiff's transfer to MCSP while his surgery

at Highland Hospital was pending.  However, the issue of why plaintiff was transferred to MCSP

while the surgery was pending is not before the court.

       B.   Defendant Vaughn

       Plaintiff alleges that defendant Vaughn violated the Eighth Amendment when he denied

plaintiff's grievance requesting immediate referral to a tertiary care center for treatment of his

perforated eardrum.  Defendants concede that the denial of a grievance seeking medical care

---

[7] See Snow v. McDaniel, 681 F.3d 978, 986-87 (9th Cir. 2012), reversed on other grounds by
Peralta v. Dillard, 774 F.3d 1076 (9th Cir. 2014) (Ninth Circuit found that the district court erred
in granting summary judgment to the Utilization Review Committee ("URP"), made up of six
prison physicians certified in family medicine or other similar disciplines, which denied plaintiff
surgery, which had been recommended by specialists and plaintiff's treating physician; the Ninth
Circuit noted that the circumstances raised an inference that the defendants were unreasonably
relying on their own non-specialized conclusions with deliberate indifference to the plaintiff's
needs).

could violate the Eighth Amendment, see Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006), but argue that defendant Vaughn did not act with deliberate indifference by denying plaintiff's grievance.

In support of their argument that defendant Vaughn did not act with deliberate indifference, defendants refer to defendant Vaughn's declaration. Defendant Vaughn states, in relevant part, that on April 22, 2019, plaintiff filed a grievance requesting that all left ear consultations and surgical appointments take place at a tertiary care facility as recommended by the ENT specialist he saw on September 27, 2018, while housed at CMF. (ECF No. 87-4 at 3.) Plaintiff wanted to go to UC Davis or Stanford University and indicated that he was not comfortable going to San Joaquin General Hospital. (Id.)

On June 21, 2019, plaintiff was interviewed for his grievance by RN Martinez and allowed to fully explain his health care grievance issues regarding his request for immediate referral to a tertiary care center rather than being seen by a local ENT first in order to evaluate the need for referral to a tertiary care center. (Id. at 4.)

On June 27, 2019, defendant Vaughn issued the Institutional Response denying plaintiff's appeal to be referred to a tertiary care treatment for treatment for his perforated tympanic membrane before being evaluated by a local ENT provider. (Id.) Defendant Vaughn states,

> Under California Correctional Health Care Services policy, specialty providers may not order additional diagnostic tests, specialty services or make referrals directly. The primary care provider is responsible to determine the necessity for all specialist recommendations; however the primary care provider is under no obligation to provide the recommended treatment and may choose an alternative strategy based on their review of the records, patient's clinical presentation and other circumstances. In addition, some services require prospective review prior to services being rendered. While an inmate-patient may refuse most health care, they may not be selective in the choice of providers. Provider assignments are made by institution health management as dictated by the needs of patients and the institution.

> Therefore, [plaintiff's] then current-provider, Dr. Ullery, was required to provide the care he determined to be medically or clinically necessary. The records show that Dr. Ullery believed that it was unclear whether a tertiary referral was necessary to address [plaintiff's] ruptured tympanic membrane and that evaluation by a local ENT provider at San Joaquin General Hospital was needed before a tertiary referral could be justified. Because Dr. Ullery had

1    a clinical basis for his decision, he was not required to follow the
     recommendation of Dr. Murton at Twin Cities Hospital.
2
3    11.  On September 19, 2019, [plaintiff's] 602 Appeal was denied at
     the Headquarters Level of California Correctional Health Care
     Services because [plaintiff] was receiving care that was medically
4    necessary to treat his condition.

5    12.  I have never seen [plaintiff] as a patient as it pertains to this
     lawsuit.  My only involvement in relation to his treatment plan was
6    the denial of his 602 Appeal to be immediately referred to a tertiary
     care center for surgery on his left ear.  As explained above, prior to
7    my 602 Appeal response, Dr. Ullery reviewed the records and
     evaluated [plaintiff] on April 3, 2019, April 17 and May 10 2019.
8    Dr. Ullery determined, appropriately in my opinion, that [plaintiff]
     should be evaluated by a local ENT first to determine whether
9    surgery was required and whether that surgery needed to occur at a
     tertiary care center.  At no point did I intentionally deny [plaintiff]
10   medically necessary treatment.

11   (Id. at 4-5.)

12       Defendant Vaughn denied plaintiff's grievance requesting referral to a tertiary center

13   because defendant Ullery referred plaintiff to a local provider for evaluation.  As discussed above,

14   defendant Ullery did not act with deliberate indifference when referring plaintiff to a local

15   provider to reexamine whether plaintiff required referral to a tertiary center for surgery.  For the

16   same reasons the undersigned finds that defendant Ullery did not act with deliberate indifference

17   in making this referral, the undersigned finds that defendant Vaughn did not act with deliberate

18   indifference in denying plaintiff's grievance requesting referral to a tertiary treatment center.  On

19   these grounds, defendant Vaughn is granted summary judgment.

20       C.  Request for Injunctive Relief

21       Defendants' summary judgment motion does not separately address plaintiff's request for

22   referral to UCSF for surgery made in the amended complaint.[8]

23       For the reasons stated herein, defendants are granted summary judgment sua sponte as to

24   plaintiff's request for an order directing them to transfer him to UCSF for surgery.

25

26   [8]  Attached to plaintiff's opposition is a record from Dr. Klosterman at Highland Hospital dated
     April 7, 2021.  (ECF No. 90 at 21.)  Dr. Klosterman writes, "On evaluation today, near
27   perforation will not be able to be fixed here at Highland, especially if OCR is needed at the same
     time.  Therefore, will have facility refer patient to UCSF Otology for further surgical evaluation."
28   (Id.)

On December 1, 2021, the undersigned denied plaintiff's motion for a preliminary injunction, filed September 17, 2021, requesting that defendants be ordered to send plaintiff to UCSF for surgery.  (ECF No. 79.)  Because plaintiff's request for an order directing defendants to send him to UCSF for surgery has been addressed in the pending motion and the briefing filed regarding plaintiff's motion for a preliminary injunction, defendants are granted summary judgment sua sponte as to this request.  Albino v. Baca, 747 F.3d 1162, 1176 (9th Cir. 2014) ("district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.").

A motion for injunction is an "extraordinary remedy" that may only be granted when plaintiff has demonstrated a likelihood of success on the merits, among other factors.  See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

As discussed above, plaintiff has not demonstrated a likelihood of success on the merits of his claims against defendants Vaughn and Ullery, the defendants who could respond to an order directing that plaintiff receive surgery at UCSF.  In addition, in his declaration, defendant Ullery states that Dr. Yee is capable of performing plaintiff's surgery.  Plaintiff does not have a constitutional right to have the surgery performed at the institution of his choosing, i.e., UCSF.  See Torricellas v. Bedford, 2017 WL 3275969, at *4 (C.D. Cal. May 10, 2017) ("An inmate does not have a constitutional right to receive medical treatment from the physician or other medical provider of his or her choice."); Martel v. California Dept. of Corrections, 2007 WL 2288316, at *5 (E.D. Cal. Aug. 8, 2007) ("denial of request to be treated by doctor of choice does not violate Eighth Amendment).[9]  For these reasons, plaintiff's request for an order directing defendants to transfer plaintiff to UCSF for surgery is denied.

---

[9]  In the December 1, 2021 order denying plaintiff's motion for injunctive relief, the undersigned found that the court could not order UCSF to accept plaintiff for surgery when they are not taking incarcerated patients, because UCSF is not a party to this action.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 112 (1969).  It is unclear whether UCSF is still no longer taking incarcerated patients.  However, even if UCSF is now accepting incarcerated patients, plaintiff does not have a constitutional right to receive medical treatment at UCSF when Dr. Yee can perform the surgery.

Accordingly, IT IS HEREBY ORDERED that:

1. The motion for summary judgment on behalf of defendant Aguilera (ECF No. 71) is granted as to plaintiff's claim that defendant Aguilera failed to properly treat his ear infections; defendant Aguilera's motion for summary judgment is denied as to plaintiff's claim that defendant Aguilera delayed his treatment; and

2. The motion for summary judgment on behalf of defendants Ullery and Vaughn (ECF No. 87) is granted.

Dated:  September 28, 2022

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Singh2048.sj